## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Winona Marie Urrutia, | Civ. No. 14-cv-1603 (JNE/JJK) |
| Plaintiff, | |
| v. | |
| Carolyn Colvin, | **REPORT AND** |
| Acting Commissioner of | **RECOMENDATION** |
| Social Security, | |
| Defendant. | |

---

Lionel H. Peabody, Esq., Peabody Law Office, counsel for Plaintiff.

Anna H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Winona Marie Urrutia seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability benefits. The parties have filed cross–motions for summary judgment. (Doc. Nos. 10, 12.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. §636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

**BACKGROUND**

## I. Procedural History

Plaintiff filed an application for supplemental security income on May 13, 2011, alleging a disability beginning January 20, 1992. (Tr. 72–73.)[1] The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration. (Tr. 79, 91.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and a video hearing was held on February 8, 2013. (Tr. 18, 38.) On February 23, 2013, the ALJ issued an unfavorable decision on Plaintiff's application. (Tr. 15–27.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on March 26, 2014. (Tr. 1–5.) Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. On May 21, 2014, Plaintiff filed the instant action with this Court seeking judicial review.

## II. Factual Background

Plaintiff was born on January 20, 1992, the same day as the alleged onset date of her disability. (Tr. 175.) Plaintiff was born premature and diagnosed with

---

[1] The abbreviation "Tr." Is used to refer to the transcript of the administrative record (Doc. No. 9.)

VATER associations,[2] including a missing kidney and curvature of the spine. (Tr. 481–82.)

Plaintiff has a high school diploma and has attended several college classes. (Tr. 48.) She has worked sporadically since March 2007 as a gas station attendant, dishwasher, cashier, and security guard. (Tr. 50–53, 78, 217.) Plaintiff ceased work in July 2011 due to her back pain. (Tr. 50–51.)

Plaintiff's congenital abnormalities associated with VATER included spina bifida and scoliosis. (Tr. 483–85.) Physicians treated these conditions with a back brace and fusion surgery. (Tr. 491–508.) Treatment for these conditions ceased in August 1998. (Tr. 509–10.) Plaintiff received regular checkups for her spinal condition until June 4, 2003. (Tr. 512–17.) At this last checkup, Dr. Bruce Bartie found that Plaintiff's condition was stable and that Plaintiff could participate in "normal activities such as volleyball, softball, et cetera." (Tr. 517.)

Plaintiff's medical record continued with her visit to Dr. Lorraine Turner on August 20, 2007. (Tr. 317.) Plaintiff reported normal sleep habits, including 8.5 hours nightly; indicated that she did not experience any back pain; and displayed mild-to-moderate reduced range of motion in her spine. (Tr. 317, 319.)

---

[2] VATER association is typically defined by the presence of at least three of the following congenital malformations: vertebral defects, anal atresia, cardiac defects, trachea-esophageal fistula, renal anomalies, and limb abnormalities. Benjamin D. Solomon, *VACTERL/VATER Association*, 6 ORPHANET J. RARE DIS. 56 (Aug. 16, 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3169446/.

Plaintiff became pregnant in early 2009 and was again examined by Dr. Turner. (Tr. 326.) Dr. Turner noted that Plaintiff's scoliosis would "probably not be a big issue" in the pregnancy and on consultation with Dr. Bartie, Dr. Turner confirmed her opinion regarding the lack of foreseeable issues, but recommended stabilization exercises. (Tr. 329–31.) Plaintiff did not report any major issues regarding her back to physicians during her pregnancy. (Tr. 332–35.) On July 9, 2009, Plaintiff underwent an emergency cesarean. (Tr. 376–79.) She reported no issues during her post-operation examination on August 6, 2009. (Tr. 336–37.)

When she obtained treatment for an ear infection on May 4, 2011, the examiner, Kirsten Kortesma, CNP, noted that Plaintiff's respiratory and neurological systems appeared normal. (Tr. 288–89.)

On May 13, 2011, Plaintiff filed for disability. (Tr. 212–31.) In the function report she completed on June 7, 2011, Plaintiff claimed her condition limited her in a variety of ways, including limiting her ability to "walk far, stand long, kneel, bend, reach, [and] turn." (Tr. 232–39.) She reported difficulty sleeping. (Tr. 233, 255.) She reported preparing food for 2-3 hours per day. (Tr. 234.) She also reported doing "cleaning, laundry, dishes, [and] sanitizing" for 3-4 hours per day. (*Id.*). Plaintiff said that she spent 16-17 hours per day lying prone, either managing her pain or sleeping. (Tr. 255.) Plaintiff indicated that she shopped infrequently, but purchased "food, housing supplies, [and] clothes" and said that

shopping took "about an hour." (Tr. 235.) Plaintiff's reported "often" participating in her hobbies of "reading, watching TV, [and] play[ing] outside as long as [she could]." (Tr. 236.) She indicated that there had been no change in her ability to participate in these activities since the inception of her condition. (*Id.*).

Plaintiff's medical record continued on July 28, 2011, when she presented to Disability Consultants P.C. complaining of neck and back pain. (Tr. 291.) She reported being unable to lift her 24-pound son, unable to walk further than 60 feet without pain, unable to stand longer than 15 minutes, and unable to sit longer than 30 minutes. (*Id.*). The treating physician, Dr. Neil Johnson, noted Plaintiff's "[b]reath sound[ed] . . . of a normal intensity," found no neurological abnormalities, and reported some decreased range of motion in Plaintiff's spine. (Tr. 292–93.) Dr. Johnson concluded that Plaintiff was restricted from bending and lifting, could not participate in heavy lifting, and needed to be able to switch positions. (Tr. 293.) He also concluded that Plaintiff "probably could sit 6 hours in an 8 hour day . . . [and] could probably stand 2 hours." (*Id.*).

Two weeks after this visit, on August 11, 2011, Dr. Charles Grant found Plaintiff's medical record insufficient for a finding of a disability, and Plaintiff's claim for SSI payments was denied. (Tr. 72–82.)

On August 30, 2011, Plaintiff fell on her buttocks and heard a crack in her back. (Tr. 306.) The next day, she went to Dr. Gary Foley, complaining of headaches, back pain that did not radiate, and tingling in her lower extremities.

(Tr. 306–08.) Dr. Foley found no respiratory distress. (Tr. 308.) Plaintiff's x-ray was examined by Dr. Bruce Derauf, who found no acute abnormalities. (Tr. 309, 311–14.) Plaintiff was diagnosed with a back contusion and a cervical sprain; she was prescribed hydrocodone for pain management and cyclobenzaprine for muscle spasms. (Tr. 307, 310.)

Plaintiff filed for reconsideration on October 7, 2011, claiming that her August 30, 2011 fall had worsened her condition. (Tr. 252.) She reported that her back hurt and it hurt to breathe. (*Id.*). She reported severe problems sleeping and indicated that she spent roughly 16-17 hours per day lying prone. (Tr. 255.) She also reported that she did not carry bags of groceries, and often remained in the car during shopping trips. (Tr. 256.)

On reconsideration, Dr. Steven Richards examined evidence including Plaintiff's function reports, Dr. Johnson's examination, and medical records regarding Plaintiff's August 2011 injury. (Tr. 83–94.) Dr. Richards determined that Plaintiff was not disabled on November 15, 2011. (Tr. 91–93.) On December 7, 2011, Plaintiff requested a hearing before an ALJ. (Tr. 119.)

After filing for a hearing in front of an ALJ, Plaintiff saw Dr. Joanna Burns five times in five months regarding the worsening back pain following her fall. (Tr. 470–79.) She consistently reported extreme pain and low mobility. (*Id.*). She also described the difficulty she had in attending classes at school. (Tr. 472.) Plaintiff was referred for physical therapy by Dr. Burns, and began treatment on February

6

3, 2012. (Tr. 420.) She attended nine sessions, through March 16, 2012. (Tr. 421–35.) She indicated that physical therapy helped control her pain. (Tr. 420, 426, 428, 429, 431.) During these sessions, Plaintiff reported that she could walk 20 minutes without significant pain, and that the pain in her back had gotten progressively worse since her pregnancy. (Tr. 432.) After the ninth session, Plaintiff did not continue physical therapy. (Tr. 420, 432.)

Plaintiff presented to Twin Cities Spine Center on April 6, 2012, complaining of "persistent pain in her whole spine" and headaches. (Tr. 339.) On the questionnaire for her visit, Plaintiff indicated that a spinal deformity contributed to her current spine problem; she also indicated that no trauma or other injury contributed to her spine problem. (Tr. 343.) She reported problems doing chores and experiencing severe pain. (Tr. 342.) Plaintiff also reported that she was forced to stay home from school or work nine days out of the past 28. (Tr. 344.) She complained of breathing problems, headaches, and frequent urination. (Tr. 345.) Plaintiff reported severe, chronic pain that restricted her life activities to a significant degree. (Tr. 342–61.) Plaintiff indicated that she was not applying for compensation from SSI due to her back problem. (Tr. 344.) She also indicated that she was participating in physical therapy which seemed to have helped. (Tr. 339.) Terry P. Panvica, PA-C examined Plaintiff. (*Id.*). She recommended against surgical treatment, and suggested that Plaintiff would be a candidate for a "multi faceted pain management approach." (Tr. 340.)

One week later, on April 13, 2012, Plaintiff saw Dr. Turner with regards to family planning. (Tr. 439.) At this visit, Plaintiff completed a Patient Health Questionnaire. (Tr. 403.) The questionnaire asked Plaintiff to describe how often she was bothered by various health problems, where "0" indicated "not at all," and "4" indicated "nearly every day." (Tr. 403.) Plaintiff entered "0" for "trouble falling or staying asleep." (*Id.*). She entered a "0" for "feeling tired or having little energy." (*Id.*). She entered a "0" for "little interest or pleasure in doing things."

During the April 13, 2012 visit with Dr. Turner, Plaintiff reported an "above average activity level," and reported owning cats. (Tr. 439–40.) Dr. Turner reported normal respiratory findings. (*Id.*). She also reported liking school "a lot." (Tr. 439.)

On May 30, 2012, Plaintiff reported to Essentia Health's "multidisciplinary pain program" for a consultation with Rachel Scharfenberg, RN, CNP. (Tr. 362.) She described symptoms and pain similar to those described at Twin Cities Spine Center. (Tr. 339, 362–63.) Plaintiff told Scharfenberg that she did not wish to participate in the Essentia Health pain multidisciplinary program.[3] (Tr. 365.) Scharfenberg recommended that Plaintiff engage in occupational and physical conditioning and occupational therapy. (*Id.*). An x-ray ordered during this visit revealed no acute injury in Plaintiff's hips. (Tr. 370.)

---

[3] This program requires a commitment of 8 weeks, with patients participating 2 days per week, 7 hours per day. (Tr. 365.)

On June 19, 2012, Plaintiff saw Dr. Burns for follow-up after consultation at Essentia Health. (Tr. 468.) Dr. Burns noted that Plaintiff described new symptoms, including numbness, and ordered an MRI due to this new report. (*Id.*). Plaintiff received an MRI to examine possible aggravations for her back pain on June 28, 2012. (Tr. 415.) This scan revealed a number of abnormalities in Plaintiff's spine. (Tr. 416–19.)

Plaintiff developed an abscess on her chest in July 2012. (Tr. 385.) A CT scan was taken to assess the wound's healing process on October 14, 2012. (Tr. 402.) The scan revealed "well-expanded and clear" lungs, though "asymmetric due to significant scoliosis and congenital bony anomalies." (*Id.*). X-rays showed consistent results. (Tr. 411–13.)

Plaintiff became pregnant in late 2012. (Tr. 393.) During Plaintiff's initial prenatal visit on December 27, 2012, Dr. Turner reported normal respiratory and neurological findings. (Tr. 396.) At a subsequent visit on January 10, 2013, Plaintiff reported radiating pain into her right leg which sometimes caused the leg to give out. (Tr. 399, 458.) Dr. Turner again reported normal respiratory and neurological findings. (Tr. 400–01.)

Dr. Turner referred Plaintiff for physical therapy on February 1, 2013, for complaints about back pain being exacerbated by the pregnancy. (Tr. 465.) On February 7, 2013, Dr. Turner wrote a letter indicating that Plaintiff is unable to stand, sit, or walk for extended periods of time. (Tr. 467.) She also indicated that

Plaintiff's back and neck pain would "make it difficult for her to sustain any full time employment that involved her needing to walk, stand or sit for extended periods." (*Id.*). The hearing in front of the ALJ was held on February 8, 2013. (Tr. 38.)

### III. Testimony at Administrative Hearing

#### A. Plaintiff's Testimony

Plaintiff testified to the following at a hearing before the ALJ on February 8, 2013. (Tr. 38–66.) She stated that she participated on her high school's swim team, but that her participation was limited to 50 yards of breaststroke at a time, due to the congenital abnormalities from which she suffered. (Tr. 45–47.) She testified that, at age 14, a doctor had told her she could only use 40% of her lungs due to how her ribs had developed. (Tr. 47–48.)

Plaintiff stated that her VATER association developmental abnormalities, including the deformation of her ribs and spine, began at birth, but "got really bad" after her first pregnancy in 2009. (Tr. 57.) She reported that her condition has remained the same since that pregnancy, that physical therapy helped, that massage therapy and related exercises did not, and that taping helped for "a couple of hours." (Tr. 58–60.) She stated that drugs helped a little. (Tr. 60.)

Plaintiff testified about her position as a security guard at the Black Bear Casino. (Tr. 52–53.) Her job involved "standing at doors and walking around

making sure everything was where . . . it was supposed to be." (Tr. 53.) She testified that this job put a lot of strain on her back, so she quit. (*Id.*).[4]

Plaintiff testified that she worked at Fond du Lac gas station from early 2011 until July 2011. (Tr. 51.)[5] She described her job as including stocking shelves, mopping, vacuuming, and cleaning. (*Id.*). She reported she quit because she could not do those actions. (*Id.*).

Plaintiff stated that she attended college from January 2012 to May 2012, but could only sit through 15-20 minutes of class. (Tr. 48.) This resulted in her leaving class early on multiple occasions. (Tr. 48–49.) She testified that she needed to lie down to relieve the pain, so switching between standing and sitting was not an option during class. (Tr. 49.) She reported that, after sitting for about half an hour in class, she would go home to lie down; she was so tired that she would go to sleep immediately. (Tr. 55.)

Plaintiff consistently testified that she suffered from intense, unyielding, pain. (Tr. 52–66.) Lying down relieved the pain, but the pain was so constant that she needed to lie down so often that it interfered with everyday tasks that took longer than 15-20 minutes, such as cooking and cleaning up her home. (Tr. 54–55.) She testified that she could not bend. (Tr. 55.) Plaintiff reported lying down

---

[4] In her application, Plaintiff averred that she held this position from October 2010 through February 2011. (Tr. 217.)

[5] She later testified that this position started in March 2011 and ended in May 2011. (Tr. 51–52.)

for "about 75% of the day." (Tr. 57.) Plaintiff testified that she was unable to sit for 30 minutes, then stand. Instead, she needed to lie down after 30 minutes of sitting. (Tr. 63.) She said that walking short distances made her breathe hard and caused dizziness. (Tr. 61.)

Plaintiff testified that she cares for her three year-old child. (Tr. 64.) She stated that he "plays with himself" and that she makes food for him. (*Id.*). She reported that errands were limited to 15 minutes of grocery shopping, and that she got out of the house once per week. (Tr. 64–65.) She stated that her cousin helped her with grocery shopping. (*Id.*).

### B. Vocational Expert's Testimony

Dr. Jeffrey Magrowski testified as a vocational expert ("VE") at the hearing on February 8, 2014. (Tr. 66–69.)

The ALJ asked the VE to opine on whether a hypothetical person with the following limitations could perform any of Plaintiff's past jobs:

> Would you please consider a hypothetical fact pattern that involves a young lady, early 20s, with this work history and a high school level education; and she would have no limitations from behavioral health. With regard to physical capacities, she presents her basic work activity with capacity for a narrow range of light to sedentary exertion . . . A typical workday, she'd be expected to be on the feet doing basic work activities for about two of eight and for at least one hour at a time; also she could be expected to work in a seated position for about six of eight and for at least two at one time. Now if there's no requirement to do fast-paced production work and no requirement to walk outside on uneven ground once she gets there as part of the job, she could work eight of eight if given a sit/stand alternating

option. This also assumes that the worker can have no unusual work demands and some type of lunch period to split her shift. She could occasionally lift about 20 pounds in performing basic work activities but since she's only on the feet for two out of eight, assume that she could only carry such weight so lighter weights short distances within that two-hour time period. Also bending, stooping, etc. would be again limited but at two-hour periods so less than occasionally.

(Tr. 67.)

The VE testified that the hypothetical person could not perform any of Plaintiff's past work. (Tr. 68.) He also testified that the hypothetical person could perform unskilled sedentary work. (*Id.*). The VE concluded there were over 2,300 unskilled sedentary jobs available to the hypothetical person in Minnesota, and over 48,500 nationally. (*Id.*).

The ALJ modified the hypothetical person to include a 10-pound carrying limitation. (*Id.*). The VE testified that this change would have no effect on his answers. (*Id.*).

Plaintiff's attorney asked the VE if the available jobs could be performed if: (1) the hypothetical person were unable to sit, stand, or walk for extended periods; (2) the hypothetical person had such intermittent severe pain such that they would have to lie down two hours out of the eight worked; or (3) the hypothetical person had absences exceeding two per month. (Tr. 69.) The VE replied that such restrictions would make the jobs named by the VE infeasible on a full-time basis. (*Id.*).

### III. ALJ's Findings and Decision

On February 22, 2013, the ALJ issued an unfavorable decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act since May 13, 2011. (Tr. 18.) The ALJ followed the five-step evaluation set out in the Code of Federal Regulations. (Tr. 18–25); *see* 20 C.F.R. § 416.920(a)(4.) The Eighth Circuit Court of Appeals has summarized the five step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 13, 2011. (Tr. 20.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "severe musculoskeletal

impairment of the spine with an abnormal curve of the thoracic/cervical spine and status multiple surgeries." (*Id.*).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart B, Appendix 1. (*Id.*). The ALJ found that the impairments did not meet Listing 1.04 because "the record [did] not demonstrate compromise of a nerve root (including cauda equine) or the spinal cord" with the requisite additional findings. (Tr. 20–21.)

At step four, the ALJ determined that Plaintiff had:

the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant could occasionally lift 20 pounds; could carry a maximum of 10 pounds; [and] could complete an eight-hour workday if provided with a sit/stand alternating option.

(Tr. 21.) The ALJ made this finding after considering all of Plaintiff's symptoms and comparing them to the relevant objective medical evidence and other evidence. (*Id.*). The ALJ noted that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms to lack credibility. (*Id.*). For this finding, the ALJ compared Plaintiff's testimony regarding her inability to perform activities with Plaintiff's testimony regarding the activities undertaken in her daily life and found that "[t]he objective evidence does not support the severity of the claimant's alleged

symptoms related to physical impairments." (Tr. 22.) The ALJ also discussed Plaintiff's high school activities and medical reports. (Tr. 23.) The ALJ noted the lack of medical evidence regarding severe back pain before, during, and for the two years following Plaintiff's pregnancy in 2009. (*Id.*). The ALJ examined the numerous medical records made by Dr. Turner and others regarding Plaintiff's pain levels and attempts at pain management through July 2011. (Tr. 23–24.) The ALJ analyzed Dr. Johnson's examination of Plaintiff in July 2011, and found that Dr. Johnson's opinions regarding Plaintiff's abilities were consistent with the record; the ALJ gave Dr. Johnson's opinions weight. (Tr. 24–25.) Finally, the ALJ examined Dr. Turner's February 2013 letter opining that Plaintiff's pain made it difficult for her to walk, stand, or sit for extended periods. (Tr. 25.) The ALJ gave Dr. Turner's opinion little weight because Dr. Turner's general statements were not specific functional limitations and because the generalized statements of inability to sit, stand, or walk were not supported by the record. (*Id.*). The ALJ also examined the opinions of the state agency medical consultants, Dr. Grant and Dr. Richards, and determined that their opinions were consistent with the record and therefore should be afforded weight. (*Id.*). The ALJ concluded that Plaintiff was unable to perform any past relevant work. (*Id.*).

At step five, the ALJ found that Plaintiff had the residual functional capacity for sedentary, unskilled positions, and that, given the Plaintiff's age and education, there were jobs Plaintiff was able to perform. (Tr. 26.) The ALJ

concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy . . . [and a] finding of 'not disabled' [was] therefore appropriate." (*Id.*).

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A.) "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(1)(A.)

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. §405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006.)  "There is a notable difference between 'substantial evidence' and 'substantial evidence on

the record as a whole." *Gavin v. Heckler,* 811 F.2d 1195,1199 (8th Cir. 1987) (quotation omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).) "'Substantial evidence on the record as a whole,'…requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199 (quotation omitted.)  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of [the] evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).)

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993.)  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala* 25 F.3d 712, 714 (8th Cir. 1994) (citation omitted); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994.)

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. §404.1512(a);

*Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991.)  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted.)

## II. Analysis of the ALJ's Decision

Plaintiff raises four issues in support of her motion for summary judgment. She argues that (1) the ALJ failed to give good reasons for lightly weighing Dr. Turner's opinion in the February 2013 letter and for giving greater weight to other medical professionals; (2) the ALJ's credibility determination of Plaintiff was inconsistent with the record; (3) the ALJ's hypothetical question to the VE was inappropriate; and (4) the ALJ failed to fully develop the record. (Doc. No. 11, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), Doc. No. 18, Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Reply").)

In response, Defendant contends that the record as a whole supports each step of the ALJ's determination. (Doc. No. 13, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.").) Particularly, Defendant maintains that (1) substantial evidence supports the weight assigned to various medical opinions; (2) substantial evidence supports the ALJ's credibility determination of Plaintiff; (3)

the ALJ's hypothetical question to the VE was appropriate; and (4) the ALJ fully

developed the record and is not required to obtain an additional expert opinion to

apply medical findings to the definitions in the Listings. (*Id.*).

## A. Whether Substantial Evidence Supported the ALJ's Weight Given to Various Medical Opinions

### i.    Whether the ALJ Erred in Giving Little Weight to the Opinion of Dr. Lorraine Turner, MD

When determining the weight of evidence on the record, opinions of

treating physicians are given "controlling weight" if "well-supported by . . .

medically acceptable clinical and laboratory diagnostic techniques and [are] not

inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785,

790 (8th Cir. 2005) (citation omitted.) Since the entire record must be evaluated

as a whole, "a treating physician's record does not automatically control." *Id.*

When a treating physician's own examination notes conflict with that physician's

given opinion, an ALJ may properly discount that opinion. *Howe v. Astrue*, 499

F.3d 835, 840-41 (8th Cir. 2007.) An ALJ may also refrain from giving controlling

weight to a treating physician's opinion if that opinion "consists of nothing more

than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th

Cir. 1996.) In the instant case, the ALJ gave little weight to Dr. Turner's opinions

in her February 2013 letter regarding Plaintiff's functional capabilities because

they were inconsistent with the record as a whole; they were inconsistent with Dr.

Turner's own examination notes regarding Plaintiff; and the letter included vague

conclusions about Plaintiff's physical abilities. (Tr. 25)

The ALJ found that Dr. Turner's opinion was inconsistent with a record that reflected "mostly normal physical examinations, but with decreased ROM and tenderness in her spine." (*Id.*). The ALJ noted that, although Dr. Turner's letter stressed the significant pain Plaintiff experienced and its effect on her everyday activities, Plaintiff declined to undergo pain management treatment. (Tr. 25, 365, 432.) The ALJ also observed that Dr. Turner's opinion of Plaintiff's abilities were contradicted by Plaintiff's indications that she is able to function independently, perform her personal care, complete activities of daily living, and care for her young son. (Tr. 25, 64-65.)

Plaintiff argues that the ALJ failed to consider all of the factors described by 20 C.F.R. § 416.927(c.)[6] As a threshold matter, the Court notes that 20 C.F.R. § 416.927(c) only requires an ALJ to consider its factors, not to explicitly analyze them in a written opinion. *See* 20 C.F.R. § 416.927(c.) The regulation does require, however, that an ALJ "give good reasons" in a decision determining the weight given to a treating physician's opinion. *Id.* at § 416.927(c)(2). The parties do not dispute that Dr. Turner was a treating physician. Def.'s Mem. 16; Pl.'s Mem. 20.  During her multiple meetings with Plaintiff in 2007, 2009, 2012, and 2013, Dr. Turner noted Plaintiff's subjective

---

[6] These factors include (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the opinion compared to the objective medical evidence; (4) the consistency of the opinion with the evidence on the record as a whole; (5) the medical officer's specialization, if any; and (6) any other factors. *See* 20 C.F.R. § 416.927(c.)

complaints about pain, but did not opine or take notes on objective medical evidence available in Plaintiff's medical record after Plaintiff's fall allegedly significantly impacted her condition. (Tr. 317, 326, 393, 467.) Indeed, as the ALJ noted, Dr. Turner's medical notes sometimes contradicted Plaintiff's claims regarding her pain and physical abilities. (Tr. 25;) s*ee, e.g.*, (Tr. 317-19, 326-30, 393-98) (indicating high capacity for physical ability and "above average" level of physical activity, in conjunction with little to no change in reported back pain.) Dr. Turner's opinion in her February 2013 letter conflicts with evidence on the record. *See* (Tr. 25) (discussing discrepancies between the record and Dr. Turner's opinion.) *Compare* (Tr. 467) *with* (Tr. 403) (showing Plaintiff self-reportedly did not suffer from lack of sleep, contrary to Dr. Turner's opinion.) Plaintiff never described Dr. Turner as a back or pain specialist, and Plaintiff did not present other factors for the ALJ's consideration. After reviewing the record as a whole, the Court finds that there is substantial evidence showing the ALJ properly considered the factors under 20 C.F.R. § 416.927(c) and gave "good reasons" for attributing little weight to Dr. Turner's opinion.

### ii.  Whether the ALJ Erred in Giving Weight to the Opinion of Dr. A. Neil Johnson, MD.

Plaintiff takes issue with the ALJ's reliance on the reports of Dr. Johnson, who examined Plaintiff on July 28, 2011. (Pl.'s Mem. 26.) Specifically, Plaintiff contends that these reports fail to take Plaintiff's medical record following her August 31, 2011 fall into account. (*Id.*). An examiner is not, however, required to

have the entire medical record in front of him for an ALJ to give weight to his opinion. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (discussing how some reports will necessarily occur before the completion of the medical record.) In this case, the consultative report of Dr. Richards examined evidence compiled from a large portion of Plaintiff's medical record, including Dr. Johnson's exam, Dr. Grant's evaluation, and evidence submitted by Plaintiff after her August 31, 2011 fall. (Tr. 83–91.)

The ALJ gave weight to Dr. Johnson's consultative examination in July 2011 because it was consistent with the medical record. (Tr. 24–25.) Prior to the consultation, Plaintiff complained of severe back pain and an inability to stand longer than 15 minutes or sit longer than 30 minutes. (Tr. 291.) Dr. Johnson observed a "moderately severe levoscoliotic curve," "partial fusion of all segments between T2 and 7," "anomalous development," narrowed disc spaces, and "fusion of the C5-T1 segments." (Tr. 294.) Dr. Johnson diagnosed Plaintiff with scoliosis and concluded that she could sit six hours and stand two hours in an eight-hour day. (Tr. 293.) The Court's review of the record shows that Dr. Johnson's July 28, 2011 report was consistent with the medical evidence as of that date. (Tr. 287–89, 317–37.) In later medical exams after her fall, Plaintiff's complaints remained largely unchanged, as did the objective medical results and diagnoses. (Tr. 339–480.) X-rays taken for her August 31, 2011 fall were examined and were found to lack "acute appearing abnormalities." (Tr. 309.) The

ALJ did not err in considering the opinion of Dr. Johnson along with the medical evidence as a whole.

### iii.    Whether the ALJ Erred in Considering the Opinions of Consulting Medical Experts

Plaintiff argues that the ALJ should not have afforded weight to the opinions of Dr. Charles T. Grant, MD, and Dr. Steven Richards, MD, who performed consultative examinations of the medical record for the state agency. An ALJ should evaluate nonexamining sources to the extent that they consider all the pertinent evidence in a claim. 20 C.F.R. § 416.927(c)(3.) Both exams evaluated Dr. Johnson's examination and conclusion regarding Plaintiff's functional capacity. (Tr. 73–94.) Dr. Richards, on re-evaluation, noted Plaintiff had suffered a back injury around September 2011. (Tr. 84.) Plaintiff submitted evidence for Dr. Richards's review on October 31, 2011. (*Id.*).

The ALJ gave weight to the opinions of Dr. Richards and Dr. Grant to the extent that they supported Dr. Johnson's opinion. (Tr. 25.) As previously discussed, supra, Dr. Johnson's opinion and the ALJ's reliance on it was supported by substantial evidence in the record.[7] The Court therefore finds that the ALJ did not err in considering the opinions of Dr. Grant and Dr. Richards.

---

[7] Plaintiff cites case law for the contention that nonexamining physicians' opinions do not constitute substantial evidence for affirming an ALJ's decision, particularly when they are inconsistent with a treating physician's opinion. (Pl.'s Mem. 23.) In the instant case, the nonexamining physicians' opinions were consistent with a treating physician's opinion. The ALJ did not rely on the

**B. Whether the ALJ Erred in Determining the Credibility of Plaintiff**

Plaintiff next argues that the ALJ erred in finding her statements about the intensity and severity of her pain and physical limitations "not entirely credible." Pl.'s Mem. 25; (Tr. 21.) In a credibility determination, an ALJ must consider medical evidence, the claimant's prior work record, and observations by third parties and treating and examining physicians relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).) The ALJ may properly discount the claimant's testimony where it is inconsistent with the record. *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012.) Here, the ALJ found that Plaintiff's claim that she suffers from back pain was substantiated by the record, but that the severity of her pain was not disabling to the extent claimed by Plaintiff. (Tr. 21.)

The ALJ reached this conclusion in part by considering Plaintiff's normal activities, including meal preparation, shopping for food, cleaning, doing laundry, washing dishes, sanitizing things, playing outside, and generally taking care of her three-and-a-half year-old child. *See Medhaug v. Astrue*, 578 F.3d 805, 817

---

nonexamining physicians' opinions alone, but instead based his determination on the pertinent evidence in the entire record, including a treating physician's report. Plaintiff's cited cases are, therefore, neither on point nor persuasive.

(8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); *see also Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (finding the plaintiff's complaints lacked credibility because, in part, of the plaintiff's role in raising an 11 year-old child); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (upholding an ALJ's credibility determination where the claimant reported that she cooked, cleaned, did laundry, studied Russian, exercised, and took care of her two small children.) The ALJ compared Plaintiff's activities with her claims regarding the severity of her symptoms in detail and found that the "objective evidence [did] not support" Plaintiff's complaints of severe limitations on "walking, standing, kneeling, bending, reaching, and turning." (Tr. 21–22.)

The ALJ also compared Plaintiff's subjective complaints with the objective medical record and found that the record did "not support the severity of [Plaintiff's] alleged symptoms related to physical impairments." (Tr. 22.) He noted that the medical record had large gaps in treatments, and that Plaintiff had declined to undergo a pain management program. *See Gray v. Apfel*, 192 F.3d 799, 803–04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancies between complaints and medical evidence, inconsistent statements, and extensive daily activities); *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (where the claimant had canceled

several physical therapy sessions); *Copeland v. Colvin*, Civil No. 4:12CV269

2013 WL 5217051 at *10–11 (E.D. Mo. Sep. 17, 2013) (where the claimant had

large gaps in treatment history.) The ALJ explained his decision in detail, noting

that Plaintiff's physical exams had revealed essentially similar findings since

2007. (Tr. 21–25.) Plaintiff experienced a fall in August 2011, and first

established care for the treatment of her back pain in December 2011. (Tr. 23.)

Objective medical evidence obtained after the August 2011 fall was similar to

evidence obtained prior to the fall. (Tr. 22–25.) The ALJ also noted Plaintiff's

"mostly normal physical examinations." (Tr. 25.)

The ALJ is in a better position than the Court to assess credibility.

*Eichelberger*, 390 F.3d at 590. Here, the ALJ integrated analyses of the objective

evidence in the record and Plaintiff's reported activities with her subjective

complaints of pain, and determined that her subjective complaints partially lacked

credibility.  Plaintiff contends that the evidence on which the ALJ relied in

reaching his credibility determination dated from prior to Plaintiff's August 31,

2011 fall, and therefore substantial evidence could not be brought to bear against

Plaintiff's statements regarding her pain. Pl.'s Mem. 25–26. This argument lacks

merit. The ALJ relied extensively on Plaintiff's own statements regarding her

functionality at the hearing on February 8, 2013, and on the record established

after Plaintiff's 2011 fall. (Tr. 23–25.) The Court finds that substantial evidence in

the record supports the ALJ's determination that Plaintiff, despite her testimony

to the contrary, retained the ability to sit for six hours and stand for two hours in an eight-hour workday.

### C. Whether the ALJ Erred by Posing an Inappropriate Hypothetical to the VE

Plaintiff argues that the ALJ failed to account for all impairments that could be shown by the record in his question to the VE. Pl.'s Mem. 27. The ALJ must ask questions that "fairly reflect the abilities and impairments of the claimant as evidenced in the record." *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998.) The ALJ need not, however, ask questions that reflect impairments which are supported only by discredited or lightly-credited evidence. *Guilliams v. Barnhart*, 393 F.3d 798 (8th Cir. 2005) (allowing an ALJ to exclude limitations supported only by a claimant whose complaints of pain were found by the ALJ to lack credibility); *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (allowing an ALJ to exclude limitations supported only by a physician whose opinion was given little weight.) In short, the ALJ need only ask a hypothetical question that reflects the limitations that the ALJ finds credible. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005.) The ALJ asked the VE to consider a hypothetical person who could sit for six hours and stand for two in an eight-hour day. (Tr. 67.)

In challenging the validity of this question, the Plaintiff relies heavily on *Cox*, 160 F.3d 1203, and *Pickney v. Chater*, 96 F.3d 294 (8th Cir. 1996) for the claim that the ALJ should have questioned the VE with the limitations claimed by

Plaintiff. In both *Cox* and *Pickney*, the Eighth Circuit concluded that the ALJ did

not ask the VE about limitations that the reviewing courts found to have actually

existed based on the evidence in the record. *See Cox*, 160 F.3d at 1208; *Chater*,

96 F.3d at 296–97. Neither *Pickney* nor *Cox* support the assertion that a

reviewing court should reverse or remand an ALJ's decision based on the lack of

a question to a VE regarding a plaintiff's claimed restrictions if that reviewing

court agreed with the ALJ's decision regarding the extent of the plaintiff's

restrictions.  In the current case, the Court finds that the ALJ's determination of

Plaintiff's restrictions to be supported by substantial evidence. As such, the ALJ

was under no obligation to question the VE about the restrictions advanced by

Plaintiff. *Cox* and *Chater* do not aid Plaintiff in this context. The Court finds that

the ALJ did not err in posing the hypothetical question to the VE.

### D.  Whether the ALJ Erred in Failing to Develop the Record

#### i.  Whether the Record Was Sufficiently Developed to Support a Decision of Disability

Plaintiff first contends the ALJ had insufficient evidence before him to

come to a determination regarding disability. A disability claimant is entitled to a

full and fair hearing. *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010)

(quotation omitted.) A full and fair hearing has been given when the ALJ's

determination is based on all the evidence in the record, including the medical

records, observations of treating physicians and others, and an individual's own

description of his limitations. *Id.* The ALJ is required to order more medical

examinations and tests only if the records supplied to him do not give sufficient medical evidence to determine whether the claimant is disabled. *Id.* In this case, the ALJ properly developed the record.

The Court finds that the ALJ both had a sufficient record from which he could make a determination, and that the ALJ drew from a variety of sources in the record in making that determination. (Tr. 21–25.) The ALJ received and considered evidence from treating physicians, examining physicians, consulting physicians, a vocational expert, and Plaintiff herself. (*Id.*). This evidence spanned the time period from her birth to the day of the hearing, and included documentation from both before and after Plaintiff's August 2011 fall. (*Id.*). The records supplied to the ALJ were sufficient to establish whether or not Plaintiff was disabled due to her congenital condition and subsequent trauma, and Plaintiff received a full and fair hearing. The ALJ did not have a responsibility to further develop the record for the determination of disability, and therefore did not err in failing to do so.

### ii.    Whether the ALJ was Required to Develop the Record by Seeking Testimony on Listing Qualifications

Plaintiff also argues that the ALJ failed to develop the record by not seeking medical opinions as to whether or not Plaintiff's symptoms were medically equivalent to a listing. Pl.'s Mem. 29. She claims that her condition

meets the requirements of Listing 14.09(C)(2.)[8] (*Id.*). Plaintiff bears the burden of

establishing medical equivalency to a listing. *Carlson v. Astrue*, 604 F.3d 589,

593 (8th Cir. 2010.) Moreover, even when a plaintiff can establish that an ALJ

failed to develop the record, a plaintiff must show that the resulting omission

resulted in prejudice. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993.)

Without such a showing, reversal or remand is unwarranted. *Id.* The Court notes

that, prior to the hearing with the ALJ, Plaintiff did not raise a Listings issue.[9] At

the hearing, Plaintiff argued for eligibility under Listing 14.09(C)(2) based on the

effects on Plaintiff's musculoskeletal and respiratory systems.[10] The ALJ

---

[8] Although Listing 14.09(C) deals specifically with arthritis, Listing 1.00(L) allows claimants to establish "medical equivalency" to Listing 14.09(C) when abnormal curvature of the spine results in symptoms related to fixation of the dorsolumbar or cervical spine. Qualification for listing 14.09(C)(2) requires that a claimant have "fixation of the dorsolumbar or cervical spine . . . at 30° or more of flexion . . . and involvement of two or more organs/body/systems with one of the organs/body/systems involved to at least a moderate level of severity." 20 C.F.R. Part 404 Subp. P, Appx. 1, Listing 14.09(C)(2.)

[9] For example, the issue was not raised in the pre-hearing brief. (Tr. 275–80.)

[10] The Court cannot identify anywhere in the record where Plaintiff supplied the ALJ with an argument or evidence regarding how Plaintiff's condition affected her nervous system. It has long been the rule that, absent exceptional circumstances, a party cannot raise an issue on appeal to a court without having first raised it before the administrative agency competent to hear it. *See, e.g.*, *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administration determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action."); *see also SSM Rehabilitation Inst. v. Shalala*, 68 F.3d 266, 271 n.6 (8th Cir. 1995) (citing *Aragon* for the holding that fact-intensive issues not presented to the agency should not be initially considered by a reviewing court). The Court finds that the ALJ did not err in

expressed skepticism over whether Plaintiff could "double count" her spinal condition—which was a prerequisite qualification for consideration under Listing 14.09(C)(2) via Listing 1.00L—as one of the systems adversely affected, as contemplated in Listing 14.09(C)(2.) (Tr. 43–44.)

Plaintiff claims that the ALJ's failure to develop the record would be remedied by "an assessment by a qualified medical professional of whether [Plaintiff's] condition is equivalent to the listings." Pl.'s Reply 8. Plaintiff does not argue that the ALJ had insufficient evidence before him to come to a determination about her medical condition.[11] Instead, Plaintiff argues that the ALJ should have requested that a medical professional opine as to whether or not Plaintiff's conditions meet the requirements of the listings.

As Plaintiff recognizes in her memoranda, the flaw the ALJ found with Plaintiff's argument regarding the listings was legal, rather than factual. (Tr. 43–44.) The ALJ doubted that Plaintiff would be allowed to "double count" her spinal

failing to consider equivalency based on what effect, if any, Plaintiff's condition has on her nervous system.

[11] Plaintiff forwards *Dozier v. Heckler*, 754 F.2d 274 (8th Cir. 1985) for the contention that an ALJ must require a consultative examination when the ALJ has an insufficient basis to make a determination. (Pl's Mem. 29.) In *Dozier*, the ALJ made a determination about the severity of the plaintiff's headaches when there was no medical evidence on the record to either prove or disprove that claim. 754 F.2d at 276. Here, the ALJ has significant medical evidence on the record to weigh Plaintiff's claims about her conditions. Indeed, Plaintiff argues in her memoranda that sufficient evidence exists to come to her proposed conclusion regarding the listings. (Pl.'s Mem. 28–29; Pl's Reply 7–8.) *Dozier* does not apply to the case at hand.

condition, which was the factor that qualified her for consideration under the arthritis listing, as an "affected system" derivative of her condition. (*Id.*). In other words, the ALJ disagreed with Plaintiff about the interpretation of the regulations. Plaintiff's argument regarding development of the record, then, contends that a court should find reversible error when an ALJ fails to receive expert testimony from a medical professional regarding interpretation of SSA regulations.[12]

The purpose behind requiring an ALJ to develop the record is to collect the objective *facts* about a plaintiff's condition. *See Sellars v. Secretary, Dept. of Health, Education & Welfare*, 458 F.2d 984, 986 (8th Cir. 1972.) Development of the record does not require an ALJ to solicit legal advice. It is the role of the ALJ to determine whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations, and to interpret those regulations. *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998) (discussing the ALJ's role in determining a condition's applicability to the listings.) Plaintiff provides no case support for her argument that a medical expert should have been consulted for regulation interpretation, and cannot establish that the lack of such testimony prejudiced the outcome. The Court cannot identify any reason why an ALJ should export his legal interpretation of an SSA regulation to a medical professional. The Court therefore finds that the ALJ did not err by

---

[12] Plaintiff does not argue that the ALJ's interpretation of the regulations, in and of itself, was in error. The Court therefore does not consider this issue.

declining to consult a medical expert regarding Plaintiff's condition's applicability to the listings.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's motion for summary judgment (Doc. No. 10), be **DENIED**;

2. Defendant's motion for summary judgment (Doc. No. 12), be **GRANTED**; and

3. This case be **DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.

Date:  March 30, 2015

s/ *Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by April 14, 2015, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within 14 days after service thereof. A judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court and it is therefore not appealable to the Court of Appeals.